In re ESTATE OF JOHN R. LUNDAHL, Deceased (Elizabeth Gabel, Claimant-Appellee, v. Thomas D. Murray, Independent Ex'r of the Estate of John R. Lundahl, Appellant).

Second District    No. 2—01—0508

Opinion filed July 16, 2002.

Thomas D. Murray and Jennifer B. Cromheecke, both of Bryce, Downey, Murray, Jensen & Mikus, L.L.C., of Chicago, for appellant.

Matthew T. Caruso, of Fitzsimmons, Roberts & Paine, of Wheaton, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Thomas D. Murray, the independent executor of the estate of John R. Lundahl, deceased, appeals a judgment granting claimant, Elizabeth Gabel, relief against the Lundahl estate. Gabel's claim relies on a 1990 agreed order annulling Lundahl's marriage to Gabel and requiring the estate of Lundahl, who was then alive but disabled, to pay Gabel $1,700 a month "for the balance of her natural life." The trial court ordered Murray to pay Gabel $1,700 monthly out of the estate as long as she lives or to purchase an equivalent annuity. Murray timely appealed.

On appeal, Murray argues that the judgment is erroneous because (1) Gabel's right to payments under the agreement ended when Lundahl died; (2) Gabel's claim is merely contingent and thus not a valid charge on the decedent's estate; (3) Gabel's claim is not ripe; and (4) recognizing Gabel's claim would keep the estate open unreasonably long. Because we agree with the first assertion, we reverse without considering Murray's other arguments.

We set out the pertinent facts. Lundahl executed a will in 1983 and a codicil in 1985. On August 22, 1988, Lundahl and Gabel were purportedly married in Florida. By 1989, Lundahl had become disabled and the court had appointed guardians for his person and his estate.

That year, the plenary guardians of Lundahl's person and estate sued in Du Page County to invalidate the marriage. On June 13, 1990, the circuit court declared the marriage void, and "Lundahl and Associates" (the guardians of Lundahl's estate and person, Lundahl's two children, and the attorneys for these parties) and "Gabel and Associates" (Gabel and her attorneys) entered into the agreement on which Gabel now bases her claim. (It is helpful to keep in mind that, as Lundahl was alive at this time, the "Estate" the agreement references is not the testamentary estate that was created upon his death.)

The agreement recites that each party releases any possible claims against the other and that these mutual releases protect the *"heirs, executors, *** and agents of the individuals comprising Lundahl and Associates and Gabel and Associates."* (Emphasis added.) Also, part of the consideration for the mutual releases is the guardians' desire "to preserve the assets of John R. Lundahl [and] his Estate." Paragraph 6(a) reads:

> "John R. Lundahl, his estate, and Keith E. Roberts as Guardian of the Estate of John R. Lundahl *** agree to pay Elizabeth L. Gabel the sum of *seventeen hundred dollars per month for the balance of her natural life commencing on July 1, 1990 and the first day of each month thereafter.* Said money will be in lieu of any money now being received by virtue of her alleged marital relationship with John R. Lundahl. Any and all Orders or other activities providing Elizabeth L. Gabel-Lundahl with monies by virtue of the ceremony of August 22, 1988 will be vacated and void as of said date. The Estate of John R. Lundahl *** will make no claim for monies and/or property heretofore received by Elizabeth L. Gabel by virtue of any events including but not limited to those of August 22, 1988. The Estate of John R. Lundahl reserves the right to fund any part of said lifetime payments of seventeen hundred dollars per month to Elizabeth L. Gabel by *** purchase of a life annuity contract." (Emphasis added.)

On June 12, 2000, Lundahl died. On August 4, 2000, the circuit court admitted Lundahl's will to probate and appointed Murray the independent executor of Lundahl's testamentary estate.

On February 26, 2001, Gabel filed her claim. She asserted that, while he lived, Lundahl paid Gabel $1,700 per month per the 1990 agreement; that Lundahl's contract survived his death; and that Lundahl's testamentary estate owed her $1,700 per month for the rest of her life.

Murray responded with several arguments. First, Gabel's claim was not ripe because, since Lundahl died, the estate had still paid Gabel $1,700 each month, albeit under protest. Second, Gabel's claim was contingent and thus impermissible under section 18—4 of the

Probate Act of 1975 (Act) (755 ILCS 5/18—4 (West 2000)), because any future payment vested only in the uncertain event that Gabel was still alive when it came due.

Murray argued third that the agreement did not entitle Gabel to any payments at all after Lundahl died. Murray reasoned that the payments were akin to maintenance. As such, they stopped at the payor's death unless the agreement plainly stated otherwise, which it did not. Murray observed in part that, under section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/510(c) (West 2000)), the obligation to pay future maintenance ends when either party dies, unless the parties have agreed otherwise in writing.

Gabel replied that she could file her claim even if the estate had not yet refused to pay her, that the claim was not contingent because Lundahl's contractual obligation was fixed before he died, and that the parties did agree in 1990 that Gabel would receive payments even after Lundahl died. The trial court ruled that Gabel's right to monthly payments survived Lundahl's death and that her claim was not contingent under the Act. The court ordered Murray to pay Gabel $1,700 per month from the estate for the rest of Gabel's life or to purchase an annuity as provided in the 1990 agreement. Murray timely appealed.

On appeal, Murray advances several reasons for reversing the judgment in whole or in part. However, we need address only one of these arguments because it wholly disposes of the case. We agree with Murray that Gabel's entitlement to payments under the agreement ended with Lundahl's death. Therefore, because Gabel has no claim against the estate, we reverse the judgment completely.

■ Gabel has moved to strike part of the statement of facts in Murray's appellate brief. The first four paragraphs of this statement of facts lack any references to the record and merely reiterate unsupported and unsworn assertions that Murray made in a trial court brief. A party's statement of facts may not rely on matters outside the record and must refer appropriately to the pages of the record on appeal. See 188 Ill. 2d R. 341(e)(6); *In re Marriage of Drysch*, 314 Ill. App. 3d 640, 643 (2000). Therefore, we strike the first four paragraphs of Murray's statement of facts.

Turning to the merits, we agree with Murray that Gabel's right to monthly payments under the agreement ended with Lundahl's death. Therefore, after making the payment due June 1, 2000, the estate owed her nothing more. Because the 1990 agreement does not unmistakably extend Lundahl's financial obligation past his death, we presume that the parties intended that the monthly payments, which resemble periodic maintenance, would end when Lundahl died.

We do agree with Gabel that the Marriage Act does not control this case directly. Murray argues that, because the 1990 order awarded Gabel maintenance on the dissolution of her marriage to Lundahl, the court could not order that the payments continue to accrue after Lundahl died. See Ill. Rev. Stat. 1989, ch. 40, par. 510(c); *In re Marriage of Clarke*, 125 Ill. App. 3d 432, 436 (1984). However, the 1990 judgment did not dissolve a valid marriage but declared a purported marriage void. Also, the judgment did not force Lundahl's estate to support Gabel; the estate agreed to do so. Thus, the issue is not what a court could have required Lundahl's estate to do without the estate's consent but what the estate bound itself to do.

Because Gabel and Lundahl never validly married, the 1990 agreement is not a "marital settlement agreement" or a "maintenance agreement" in the strict sense. However, Gabel and Lundahl did have what, in practical terms, was a marriage, and the 1990 agreement settled disputes that arose from the invalidation of that relationship. Thus, although we have found no case quite akin to this one, we may look to opinions that consider whether a marital settlement agreement that requires periodic maintenance entitles the recipient to keep receiving maintenance even after the payor has died. Generally, courts do not impose such a burden on the late spouse's estate unless the agreement itself unmistakably demonstrates that the husband and wife intended this result.

*Lennahan v. O'Keefe*, 107 Ill. 620 (1883), appears to be the earliest Illinois opinion on point. *Lennahan* turned on the construction of a simple divorce decree with no settlement agreement. Nonetheless, the court set out the rule that courts later applied to agreements.

In *Lennahan*, the decree required the husband to pay the wife yearly alimony until further court order and made the obligation a lien on certain property. After the husband died, the circuit court, on application by his estate, held that the wife's right to alimony ended with the husband's death. The supreme court affirmed, rejecting the wife's claim that the divorce decree bound the husband's estate to pay her periodic alimony. Noting that the decree had made alimony modifiable, the court held:

> "[T]he only question is, what effect has the death of the [husband] upon such a decree? In the absence of language showing, unequivocally, that the intention was to bind the heir by such a decree, we are of opinion [*sic*] that it does not do so, but that its life terminates with the life of the [husband]." *Lennahan*, 107 Ill. at 626.

The court used both history and policy to support its rule of strict construction. At common law, the court observed, alimony was "but an allowance during the joint lives of the husband and wife, or so long

as they should live separately." *Lennahan*, 107 Ill. at 626. Even under more recent American law, alimony had never been considered a debt against the heir because the husband's duty to maintain the wife ended with his death. *Lennahan*, 107 Ill. at 626. Moreover, to presume that a divorce decree obligated a husband's estate to pay his wife maintenance would unduly interfere with the rightful claims of the decedent's heirs and creditors as long as the wife lived, perhaps even effecting "an entire appropriation of the husband's estate." *Lennahan*, 107 Ill. at 627.

In *Storey v. Storey*, 125 Ill. 608 (1888), the wife sought to compel her late husband's estate to pay her $2,000 yearly alimony under a consent decree that entitled her to receive alimony "*for so long as she may be and remain sole and unmarried.*" (Emphasis in original.) *Storey*, 125 Ill. at 610-11. The supreme court held that the wife was entitled to receive alimony even after the husband died.

The *Storey* court distinguished *Lennahan* by reading the decree in conjunction with other legal instruments to conclude that the husband and wife had intended to bind his estate. Specifically, the decree created a lien on certain real estate, required the husband to keep the property insured for $2,000 per year, and ordered him to execute a trust deed on the property. The husband executed a trust deed and a bond that expressly bound him *and* his "*heirs, executors and administrators*" to pay the bond and maintain insurance on the property. (Emphasis in original.) *Storey*, 125 Ill. at 613. The court reasoned that, had the husband not intended that the wife receive alimony after he died, he would not have so obligated his heirs, executors, and administrators. *Storey*, 125 Ill. at 613.

In *Luce v. Providence Union National Bank*, 122 F. Supp. 21 (D. R.I. 1954), *aff'd*, 217 F.2d 648 (1st Cir. 1954), the court, applying Illinois law, refused to grant the claimant alimony allegedly accruing after her ex-husband's death. The claimant relied on a consent divorce decree that ordered the husband to pay $165-per-month alimony as long as the claimant remained single. The district court explained that *Lennahan* controlled. The decree was merely silent on whether alimony survived the husband's death. Without a clear statement that the estate would be liable for alimony, the claimant could not recover. *Luce*, 122 F. Supp. at 24. *Storey* was distinguishable because there, the documents executed with the consent decree clearly implied that the alimony obligation survived the husband's death. *Luce*, 122 F. Supp. at 23-24.

In *Cross v. Cross*, 5 Ill. 2d 456 (1955), the wife sought to establish her right to permanent alimony from her deceased husband's estate. The claim was based on a divorce decree that expressly reserved the

issue of alimony. In denying the wife permanent alimony, the supreme court held that the reservation in the divorce decree was not evidence that the husband and wife agreed to bind his heirs to pay the wife alimony after he died. *Cross*, 5 Ill. 2d at 462-63. Reading such an agreement into the decree would be contrary not only to precedent but also to "the avowed objective of alimony, which is to continue in a measure the obligation of support that exists only during the lifetime of the parties." *Cross*, 5 Ill. 2d at 463-64.

■ Courts elsewhere usually follow *Lennahan*'s rule, refusing to require the late spouse's estate to pay "post-mortem" maintenance unless the marital judgment or settlement agreement unmistakably requires that result. See, *e.g.*, *In re Estate of Kettering*, 376 P.2d 983, 986 (Colo. 1962); *O'Malley v. Pan American Bank of Orlando, N.A.*, 384 So. 2d 1258, 1260 (Fla. 1980); *Dolvin v. Dolvin*, 248 Ga. 439, 284 S.E.2d 254 (1981); *In re Estate of Sweeney*, 210 Kan. 216, 224-25, 500 P.2d 56, 64-65 (1972).

Against such a rule of strict construction one could invoke the general rule that, because a marital settlement agreement is a contract, the parties' intent must be gleaned from all the circumstances and ambiguities may be resolved with extrinsic evidence. See generally *In re Marriage of Osborne*, 327 Ill. App. 3d 249, 251 (2002); *In re Marriage of Findlay*, 296 Ill. App. 3d 656, 660 (1998). A few jurisdictions have used this approach to require a decedent's estate to pay periodic maintenance even when the marital settlement agreement itself does not plainly require this result. See, *e.g.*, *In re Yoss' Estate*, 24 N.W.2d 399 (Iowa 1946); *In re Estate of Gustafson*, 287 N.W.2d 700 (N.D. 1980). See also *Masters v. Masters*, 155 Neb. 569, 573, 52 N.W.2d 802, 804-05 (1952) (contrasting *Lennahan* rule with broader contract-law approach without deciding between them).

We decline to adopt the broader approach. Our courts regularly state that we must treat a marital settlement agreement like any contract, trying to ascertain the parties' intent and using parol evidence to resolve ambiguities. However, no Illinois case applies these general rules, without more, to decide whether an agreement binds a deceased spouse's estate to pay periodic maintenance or child support after he has died. *Lennahan*'s rule, which resolves any ambiguities against the claimant and thus eschews using extrinsic evidence of intent, is still good law.

Also, there are sound reasons to resolve doubtful cases against burdening estates with charges stemming from dissolved or invalidated marriages. First, because courts have regularly stated that maintenance is an allowance for the beneficiary while both parties are alive (see *Cross*, 5 Ill. 2d at 464), it is fair to assume that the parties to a

marital settlement agreement were aware of this principle and planned accordingly. Second, an open-ended rule would produce much uncertainty, risking interference with the testator's right to dispose of his property as he wishes and threatening inconvenience and expense to the estate and the heirs. See *Lennahan*, 107 Ill. at 627; *In re Estate of Kuhns*, 550 P.2d 816, 818 (Alaska 1976); *Streight v. Streight*, 226 Or. 386, 390, 360 P.2d 304, 306 (1961). Thus, a court ought not saddle a decedent's estate with an obligation to pay periodic maintenance unless the decedent clearly agreed to this open-ended arrangement.

■ Applying these considerations here, we must reverse the trial court's judgment. The 1990 agreement does not bind Murray, as the executor of Lundahl's testamentary estate, to pay Gabel anything she was not owed while Lundahl was alive. Nothing expressly states that the payments shall continue after Lundahl dies. The recitation that Gabel shall receive payments for "the balance of her natural life" is standard "boilerplate" that does not affirmatively establish the intent to bind the decedent's estate. See *Estate of Kettering*, 376 P.2d at 986; *Dolvin*, 248 Ga. at 441, 284 S.E.2d at 255-56; *Estate of Sweeney*, 210 Kan. at 227, 500 P.2d at 65.

Also, the agreement states that its mutual releases extend to Lundahl's "heirs [and] executors" and that the consideration for the releases includes the desire of Lundahl's representatives to preserve Lundahl's assets. These passages at least suggest that the parties' intent was not to bind Lundahl's testamentary estate, which did not exist at the time of the agreement and was thus not a party to the agreement, to pay Gabel indefinitely after Lundahl's death. In any event, the agreement is ambiguous even without these qualifications.

We cannot say that the 1990 agreement unmistakably entitles Gabel to receive the monthly payments even after Lundahl's death. Therefore, the trial court erred in holding that Gabel was entitled to monthly payments accruing after June 12, 2000.

The judgment of the circuit court of Du Page County is reversed.

Reversed.

McLAREN and GROMETER, JJ., concur.